## CHANTER *v*. ROBERTS.

1. WATERS AND WATERCOURSES—FLOWAGE RIGHTS—FEE TITLE.
   The grant of the right to flow water over land along a river does not carry the fee title thereto, hence leaves in the grantor the right to convey land bordered by the river.

2. FRAUD—PRESUMPTIONS.
   Fraud is not to be lightly presumed.

3. SAME—BURDEN OF PROOF—DAMAGES.
   One asserting fraud has the burden of proof thereof and must also show that he was damaged thereby.

4. VENDOR AND PURCHASER—FRAUD—DIRECTED VERDICT.
   In purchasers' action of assumpsit for difference between value of 196-acre farm with river frontage and its value without such frontage, where record is without testimony showing that defendant vendor who agreed to convey the tract "except 36 acres

REFERENCES FOR POINTS IN HEADNOTES

[1] 56 Am. Jur., Waters, § 381.
[2-3] 23 Am. Jur., Fraud and Deceit, §§ 20, 172, 24 Am. Jur., Fraud and Deceit, § 256.
[4-6] 55 Am. Jur., Vendor and Purchaser, §§ 68, 75.

* * * heretofore conveyed" made any fraudulent representations to plaintiffs, defendant's motions for directed verdict should have been granted.

5. Same—Flowage Rights—Fraud—Evidence.

Under land contract whereby vendor agreed to convey 196-acre farm "except 36 acres * * * heretofore conveyed" to another, purchasers were not entitled to damages because such 36-acre tract was overflowed by holder of flowage rights previously granted on ground of fraud of vendor, where neither the the contract nor other proof supports charge of fraud.

6. Appeal and Error—Questions Reviewable—Land Contracts—Fraud—Evidence.

Where plaintiffs failed to show fraud on part of defendant incident to land contract for sale of 196-acre farm, questions as to condonation, ratification by part performance, and adequacy of proof of damages and boundaries of flowage rights and other errors in trial and charge are not considered.

Appeal from Kalamazoo; Weimer (George V.), J. Submitted June 15, 1948. (Docket No. 23, Calendar No. 44,073.) Decided October 4, 1948. Rehearing denied November 12, 1948.

Assumpsit by Paul Chanter and wife against Elliott B. Roberts for difference in value between land as represented and conveyed. Verdict and judgment for plaintiffs. Defendant appeals. Reversed and judgment ordered entered for defendant.

*Fox & Fox,* for plaintiffs.

*Howard & Howard,* for defendant.

Bushnell, C.J. Plaintiff Paul Chanter, who operates a grocery and meat market in Kalamazoo, Michigan, and Audrey L. Chanter, his wife, in 1945 purchased lands in Texas from defendant Elliott B. Roberts, a farmer, rancher and real estate dealer at McAllen, Texas. The purchase price was $39,000, of which plaintiffs paid around $15,000 in cash, in

addition to the transfer to Roberts of their equity in a house and lot in Kalamazoo worth about $3,200, leaving a mortgage balance of $20,800, the exact amount being unimportant so far as the present controversy is concerned.

Early in November of 1946, when plaintiffs were in default on their mortgage payments, Chanter went to Texas where he and Roberts discussed a trade of the Chanters' interest in the Texas property, for a farm which Roberts owned on the St. Joseph river near Centerville, consisting of 196 acres, "except 36 acres   *   *   *   heretofore conveyed to the city of Sturgis, Michigan."

After Chanter returned from Texas, he and his wife examined the St. Joseph property and made some inquiry regarding the title. Roberts thereafter came to Michigan around Thanksgiving day in 1946, and brought with him a land contract he had prepared, which, after some discussion, was executed.

The Chanters agreed to reconvey their Texas lands to Roberts and pay him the additional sum of $21,000, as follows: $1,750 one year after the date of purchase, and a like sum annually until 12 payments were made, with interest on unpaid balances at 4 per cent., payable semiannually. The land contract contained the usual provisions in addition to the following specific ones:

"14. It is contemplated that after the execution of these presents, purchaser may desire to subdivide a strip of the hereinabove described lands lying adjacent to and bordering on the St. Joseph river, not to exceed a distance of 250 feet back from the river front. Such strip to be divided into 150 lots fronting on said river of practically equal width and it is further contemplated that purchaser may sell said lots so subdivided and permission is hereby granted by seller for purchaser to so subdivide said strip of land fronting on said river and to sell the same.

"It is agreed, however, that in the sale of such lots by said purchaser, he shall begin selling the same at either the upstream or downstream end of such subdivided tract and shall successively sell the lots adjoining the one last sold unless by special permission given in writing by seller.

"15. In connection with the sale of said lots by purchaser as provided in the preceding paragraph hereof, it is agreed that seller will upon demand, convey to purchaser, or his nominee, such of said tracts so sold by purchaser upon payment by purchaser to seller of the sum of $100 for each of said tracts or lots so sold. But seller shall not be called upon to deed any tract sold by purchaser under contract unless the purchaser wishes to pay for the release of such tract and take title thereto in purchaser hereunder and pay seller $100 in cash for each lot so deeded."

There is considerable difference between the parties as to the discussions in Texas and Michigan, and the representations made by Roberts concerning the Michigan property.

Chanter testified in part as follows:

"He said he had a farm in St. Joe county, Michigan, of about 200 acres that would make a pretty nice proposition. He said 'You are a young fellow and you can go after it.' It is bordered by a river and can be platted off in lots which will bring from $250 to $500, and I could pay the farm off by selling lots and then have the farm free. He drew a little sketch on a piece of paper, I haven't it now and don't know where it has gone, and showed me just how the lots would come out along the river frontage there, and that how easy it would be, and he said it was about a mile and a half and there would be 150 lots. He said there was a house and a barn, a tool shed, a corn crib on the farm, and it lay level; that they had a man on there, but he didn't know much about him. He said the river frontage was beautiful and ran right along the edge of the farm clear around

on the east side. The land would lie on the north and east side of the river, and it was a beautiful spot; it had nice picnic tables.    *    *    *

"I next talked to Mr. Roberts, as near as I can recollect, in our front room in Kalamazoo, just a couple of days before Thanksgiving. My wife, Mr. Roberts and I were present at that conversation. He came in and we visited a minute, and then he started to tell my wife about the land again. He said that he had this farm out here bordered by the river; there were nice lots, and he took a paper out and drew the map for her and showed her just how it was, and he said that could be easily divided, 150 lots, from $250 to $500, which would bring a lot of money, if it was sold, and that this river frontage was very level except one or two places had a higher bank, and it had trees and picnic tables and pump down along one end of it, which was a very nice place and could be easily sold off. He said also 'You can leave a road along back of the lots where the county can—get it started and give it to the county, and the county would take care of the road and you will have a nice road around back of the cottages.' He says 'You put one there and the rest will come very soon.'
*    *    *

"I visited this farm between the time I talked to Mr. Roberts in Texas and the time we talked to him in our living room. My wife and I went down there one Saturday and hunted the place up, and looked at the layout of buildings and the farm and the river frontage. It is a beautiful river frontage; there is no question about that. It is good fishing. We saw the river backing up to the bank along there. Some are a little higher than others; some a little lower, and then along the east end it is wooded, and you could see the point way down where the river made the bend. It was a nice looking farm. It was possible to plat lots along there."

Roberts, on the other hand, said:

"When telling him about this farm in St. Joe coun-

ty, the Sturgis dam was discussed quite a long time. I told him I had been on the farm a couple of times. The city of Sturgis had backed up water on it, and referred to it as the certain tract of land that the city of Sturgis had obtained a right to back up water on, and that it made a beautiful place for possible subdivision. I told him that the man I had purchased from, John DeHaan, suggested to me that I do that after I had purchased it. I did not have a map or blue print showing the farm property and the river through there; possibly I sketched off—showed him about how the river sat in reference to the road, it went down on the two sides of the farm. I told him to go to the bank, the American National Bank, and obtain the legal description from the abstract there or the mortgage that was on this farm, held by the American National Bank.

"We talked terms in that I agreed to trade the farm clear for clear, that would be; take back the same mortgage on the farm down there that had been up here. After we had discussed it some time, I agreed to extend the notes over to 12 years and reduce his interest from 5 to 4 per cent. At that time there were notes outstanding on the Texas property of between $23,000 and $25,000.

"Mr. Chanter didn't sign any papers down there at that time. We only agreed on the amount, and I made notes of the terms. He wanted to come to Michigan, of course, and look over the Michigan property before he would make the exchange, and make his investigation. * * * We discussed this over quite a time, maybe 2 or 3 hours, talking over the entire transaction, and numerous times referred to the backing up of the water of the Sturgis dam. I don't know as I said there was any right in the city of Sturgis along the water front of the property. I told him to go look at the farm and make his investigation and let me know what they intended to do; that I was going to make a trip in approximately 30 days to Kalamazoo anyway, and I would draw the contract along the basis that we talked over and

bring it up with me, and if it wasn't satisfactory, we would redraw."

On February 6, 1947, and without any previous discussion as to plaintiffs' claim of Roberts' fraudulent representations, the Chanters began an action in assumpsit by writ of attachment, under the provisions of 3 Comp. Laws 1929, § 14007 (Stat. Ann. § 27.651), for $25,000, which they contend is the difference between the value of the Michigan land with river frontage and its value without river frontage.

Upon trial before a jury, after denial of defendant's motion for a directed verdict, plaintiffs had a verdict for $21,420.

Roberts has appealed from the denial of his motion for a directed verdict and his subsequent motions for a judgment *non obstante veredicto* and for a new trial. He also claims errors in certain rulings of the trial judge and in the charge to the jury.

The controlling question is whether any fraudulent representations were made to the Chanters.

Plaintiffs contend that the city of Sturgis owns the fee title to the shore line of the St. Joseph river, and, therefore, they cannot acquire this title under the Roberts contract.

The granting clause of the deed to the city of Sturgis, dated May 9, 1910, reads in part as follows:

"Do by these presents grant, bargain, sell, remise, release, alien and confirm unto the said party of the second part, its successors and assigns, with the right to flow with water forever, all the following described piece or parcel of land."

This can only mean that the city of Sturgis has the right to "flow" the 36.58 acres more or less, which was specifically excepted from the Roberts-Chanter 196.96 acres described in their land contract, and that the Chanters would eventually obtain, under its terms, unencumbered title to lands to the waters'

flowage edge, and title to that beyond it subject to the right of flowage by the city of Sturgis, its successors and assigns.

*Quinn* v. *Pere Marquette Ry. Co.,* 256 Mich. 143, cited by plaintiffs as controlling, is distinguishable. That deed was in the usual warranty form, with the reservation that the lands conveyed were "to be used for railroad purposes only." The Court held in that case that the absence of a reverter clause showed that the quoted language was only a statement of the purpose of the conveyance without the intent to impose a limitation on the grant of an unconditional fee.

Without expressing an opinion which is binding on the city of Sturgis, its "successors and assigns," it appears that the deed to the city was not an unconditional grant of a fee title, but only the conveyance of a right of flowage on that part of the lands which was excepted from those which the defendant agreed to convey. The loose language used in describing these 36 acres as those "heretofore conveyed to the city of Sturgis" excepted from the land contract by reference to the previously recorded instrument, only the right to use the lands which are subject to flowage. Hence the Chanters may subsequently convey or agree to convey lots "bordered by a river" as represented by their seller. The land in question is as represented to them by Roberts, "bordered on two sides by the St. Joseph River." Furthermore, they had ample opportunity to inspect the property and determine the exact condition and nature of Roberts' title. They were advised by him prior to the execution of the land contract of the city's interest, and saw the "flooded land down there," but said Chanter:

"I didn't know where the dam was at that time. * * * I don't know whether I asked Mr. Roberts and he told me that was land that was flooded by

the Sturgis dam, but I think that is what it would be. That is in the contract. It is in the abstract. I didn't stop and say 'I am not going to deal' when he told me that 36 acres of the property was flooded by the city of Sturgis. I didn't say anything about flooding, and we went on after that and signed this agreement offered here, on which we claim we were cheated. Then I took that agreement up to a lawyer—Mr. Fox. I didn't demand the return of the Texas land, I didn't want that back under any circumstances.

"We decided to start this suit after we talked to Mr. White, and found that we couldn't deed river frontage to anyone."

White, the county surveyor, testified in part, in response to questions by the court:

"The St. Joe river runs from northeast to southwest at that point, and this farm is on the north and west side. The highway with the covered bridge does not run through this farm, that has nothing to do with this farm that I know of. The Sturgis dam is down stream from this farm. I couldn't give you the definite amount of miles, I wouldn't want to guess. I know this is part of the flood water, but I wouldn't want to guess how far the dam is. The flood water of the Sturgis dam is contiguous to part of this farm."

Fraud is not to be lightly presumed, and the burden of proof rests upon the party asserting it, who must also show that he was damaged thereby. *Mesh v. Citrin,* 299 Mich. 527; *Greer v. Parks,* 300 Mich. 492; *Oreland Equipment Co. v. Copco Steel & Engineering Corp.,* 310 Mich. 6; *Dieterle v. Pearll,* 312 Mich. 134; and *Wright v. Brown,* 317 Mich. 561. See, also, *Krushew v. Meitz,* 276 Mich. 553, and *Waldbauer v. Hoosier Casualty Co.,* 285 Mich. 405.

We cannot find any testimony in this record in

support of the claim that Roberts made any fraudulent representations to the Chanters. They received at his hands just what his representations and the language of the contract entitled them to receive.

Plaintiffs did not include in their brief any statement of the questions involved, but accepted the ones propounded by appellant.

In the absence of plaintiffs' proofs of fraudulent representations, we pass, as not controlling, defendant's questions of condonation and ratification by part performance, the surveyor's inability to determine the boundaries of the flowage rights, inadequate proof of damages suffered, and claimed errors in the trial and in the charge of the court.

Defendant's motions for a directed verdict should have been granted. The judgment entered upon the jury's verdict is vacated and the cause is remanded for the entry of a judgment of no cause of action in favor of the defendant, with costs to appellant.

SHARPE, BOYLES, REID, NORTH, DETHMERS, BUTZEL, and CARR, JJ., concurred.